```
                                                                    Priority  ____
                      UNITED STATES DISTRICT COURT                  Send      ____
JS-6                   CENTRAL DISTRICT OF CALIFORNIA                Enter     ____
                                                                    Closed    ____
                          CIVIL MINUTES - GENERAL                   JS-5/JS-6 ____
                                                                    Scan Only ____
```

================================================================================

**CASE NO.:** CV 11-08608 SJO (SSx)                **DATE:** May 29, 2012

**TITLE:** <u>Center for Community Action and Environmental Justice, et al. v. Union Pacific Corporation, et al.</u>

================================================================================

**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                            Not Present
Courtroom Clerk                             Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**         **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                 Not Present

================================================================================

**PROCEEDINGS (in chambers): ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** [Docket No. 11]

This matter comes before the Court on Defendants BNSF Railway Company ("BNSF") and Union Pacific Railroad Company's ("UP") (collectively, "Defendants") Motion to Dismiss First Amended Complaint ("Motion"), filed February 8, 2012. (ECF No. 11.) Plaintiffs Center for Community Action and Environmental Justice ("CCAEJ"), East Yard Communities for Environmental Justice ("EYCEJ"), and Natural Resources Defense Council, Inc. ("NRDC") (collectively, "Plaintiffs") filed an Opposition on February 21, 2012, and Defendants filed a Reply on March 2, 2012. The Court found this matter appropriate for disposition without oral argument and vacated the hearing set for March 19, 2012. *See* Fed. R. Civ. P. 78(b). For the following reasons, the Court GRANTS Defendants' Motion and DISMISSES Plaintiffs' First Amended Complaint ("FAC").

I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' FAC, filed February 1, 2012, alleges the following facts. (*See generally* FAC, ECF No. 10.) Plaintiffs are three non-profit environmental health and justice organizations. (FAC ¶¶ 8-18.) Plaintiff CCAEJ focuses on improving the quality of life for communities facing environmental health hazards in the Riverside/San Bernardino region of Southern California. (FAC ¶¶ 8-9.) Plaintiff EYCEJ focuses on encouraging community involvement in environmental policymaking and serves communities affected by industrial pollution in the Long Beach and Commerce/East Los Angeles areas of Southern California. (FAC ¶¶ 12-13.) The NRDC is a national membership corporation dedicated to protecting the environment and public health. (FAC ¶ 17.)

Defendants are both railroad companies that own and operate railyards throughout California. (*See generally* Compl., ECF No. 1.) This lawsuit concerns sixteen railyards situated near communities in which CCAEJ, EYCEJ, or NRDC members reside: UP Dolores/ICTF, UP Commerce, UP Roseville, UP Oakland, UP LATC, UP Colton, UP Industry, UP Stockton, and UP Mira Loma (collectively, "UP railyards"); and BNSF Hobart, BNSF San Bernardino, BNSF

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

CIVIL MINUTES - GENERAL

CASE NO.: CV 11-08608 SJO (SSx)    DATE: May 29, 2012

Commerce, BNSF Stockton, BNSF Watson, BNSF Richmond, and BNSF Barstow (collectively, "BNSF railyards").  (FAC ¶¶ 11, 16, 18-20.)  Plaintiffs allege that Defendants' railyards are a source of pollution in the form of diesel particulate matter (DPM) emitted by diesel-engined locomotives, trucks, and other equipment operating in and around the railyards.  (FAC ¶ 2.)  Diesel exhaust released into the air by diesel engines contains DPM - particles of hazardous substances such as arsenic, cadmium, nickel, inorganic lead, antimony compounds, beryllium compounds, cobalt compounds, manganese compounds, mercury compounds, phosphorus, and selenium compounds.  (FAC ¶¶ 2, 25.)  Plaintiffs assert that although DPM in diesel exhaust is initially transported by a gas through wind and air currents, DPM comprises solid - not gaseous - particles that eventually settle onto the land and water near the railyards.  (FAC ¶¶ 2, 38-39.)

Plaintiffs allege that DPM emitted from Defendants' railyards has caused and is causing an imminent and substantial risk to human health and to the environment in the vicinity of the railyards.  (FAC ¶¶ 11, 16, 18.)  Plaintiffs' members live, work, travel, and recreate near Defendants' railyards and are allegedly exposed to DPM emanating from Defendants' property.  Plaintiffs claim that people living and working in the communities near the railyards are exposed to high levels of DPM through: (1) inhalation of airborne DPM before the particles have initially settled; (2) inhalation of once-settled particles that have been stirred up by wind or passing vehicles; (3) dermal contact; and (4) ingestion of contaminated food.  (FAC ¶¶ 2, 38-39.)

The EPA and the California Air Resources Board ("CARB") have classified diesel exhaust as harmful to human health.  Plaintiffs allege that exposure to DPM emitted by the railyards puts surrounding community members at increased risk of cancer and cardiopulmonary disease, contributes to pre-term births, and causes a host of other adverse health effects associated with the individual constituent compounds that make up DPM.  (FAC ¶¶ 21-26.)

Plaintiffs assert that "Defendants are not regulated by any State or Federal agency," and that EPA regulations and voluntary agreements between CARB and Defendants have failed to ameliorate DPM pollution from the railyards to health protective levels.  (FAC ¶¶ 1, 3.)  Plaintiffs aver that "Defendants are proposing to build one huge new railyard and expand another in a heavily-polluted and densely populated area near the Port of Los Angeles."  (FAC ¶ 4.)

Based on these allegations, on October 18, 2011, Plaintiffs initiated this action against Defendants for violation of the Resource Conservation and Recovery Act ("RCRA").  On February 1, 2012, Plaintiffs filed their FAC, seeking declaratory and injunctive relief.  (*See* FAC 17, Prayer for Relief.)  Defendants move to dismiss Plaintiffs' FAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

CIVIL MINUTES - GENERAL

CASE NO.: **CV 11-08608 SJO (SSx)**     DATE: **May 29, 2012**

II. <u>DISCUSSION</u>

    A.    <u>Legal Standard</u>

A motion to dismiss pursuant to Rule12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-200 (9th Cir. 2003). In evaluating a motion to dismiss, a court accepts the plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). However, a court considering a motion to dismiss is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Dismissal is proper if the complaint lacks a "cognizable legal theory" or "sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

    B.    <u>Motion to Dismiss</u>

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). Plaintiffs, acting on behalf of their members, seek injunctive and declaratory relief under RCRA's citizen suit provision, 42 U.S.C. § 6972(a)(1)(B). The citizen suit provision grants district courts jurisdiction to restrain or compel any person "who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." *See* 42 U.S.C. § 6972(a)(1).

Accepting the allegations of the FAC as true, the Court finds that Plaintiffs have sufficiently pleaded that the DPM emitted by diesel engines in Defendants' railyards creates an imminent and substantial danger to the health of individuals living and working in the vicinity of the railyards. Thus, the Court must determine whether Plaintiffs have properly alleged that Defendants are contributing to the disposal of a solid or hazardous waste.

This case presents a novel question of law that forms the basis of Plaintiffs' FAC and Defendants' Motion. Defendants argue that the Court should decline to apply RCRA to the diesel emissions from Defendants' railyards because Congress intended for diesel emissions to be regulated under the Clean Air Act ("CAA"). Defendants contend that Plaintiffs' proposed application of RCRA conflicts with the CAA in this case and therefore must be dismissed. Defendants argue that even if the two statutes do not conflict, Plaintiffs have not stated a RCRA claim because emission of diesel exhaust does not qualify as disposal of solid or hazardous waste under RCRA.

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

CIVIL MINUTES - GENERAL

CASE NO.: CV 11-08608 SJO (SSx)          DATE: May 29, 2012

1.  Applicability of the CAA

Defendants assert that the CAA, not RCRA, provides the statutory framework applicable to this case. Defendants argue that the CAA governs air pollutants emitted by mobile and stationary sources that are powered by petroleum fuels, whereas RCRA only governs air pollutants resulting from the burning of fuels that can be independently classified as solid or hazardous waste under RCRA. Because diesel fuel used for its intended purpose is not a solid or hazardous waste under RCRA, Defendants argue that RCRA does not apply to diesel exhaust emitted by trains in Defendants' railyards. Plaintiffs' claims are not limited to DPM emitted by locomotives. Rather, Plaintiffs take issue with railyard emissions generally, regardless of individual source.

Defendants argue that post-RCRA amendments to the CAA indicate that Congress intended to regulate diesel emissions through the CAA. In 1990, after RCRA was enacted, Congress amended the CAA to include express coverage of locomotive emissions. Pursuant to section 213(a)(5) of the CAA, 42 U.S.C. § 7547(a)(5), the EPA promulgated Emissions Standards for Locomotives and Locomotive Engines ("Locomotive Rule") in 1998. 63 Fed. Reg. 18978 (April 16, 1998) (codified as amended at 40 CFR pts. 85, 89, 92). The Locomotive Rule provides emissions standards, including standards governing diesel particulate matter, for new locomotives and new locomotive engines, as well as less stringent standards for locomotives and engines already in use. *See generally* 40 CFR pts. 85, 89, 92. Pursuant to another congressional directive included in the 1990 amendments to the CAA, the EPA also promulgated the 2007 Heavy-Duty Highway Rule ("Highway Rule"), which regulates non-locomotive heavy-duty vehicle engine emissions. *Id.* pts. 69, 80, 86.

Defendants argue that Plaintiffs' proposed application of RCRA conflicts with the CAA. Plaintiffs counter that RCRA and the CAA do not conflict when applied to railyards. Because locomotives, particularly older locomotive engines, are exempt from certain portions of the CAA, Plaintiff argues that application of RCRA is necessary to "fill[] a big gap in the CAA when it comes to emissions from railyards." (Opp'n 1.) Plaintiffs argue that Defendants are exploiting a "loophole" in the CAA that the Court should address using the more general mandates of RCRA. The loophole Plaintiffs refer to is a product of the CAA's prohibition against indirect source regulation by the EPA and the express federal preemption of new locomotive regulation.

The CAA provides that "no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof." 42 U.S.C. § 7410(a)(5)(A)(ii). An indirect source is any "facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution." *Id.* § 7410(a)(5)(C). The statute provides some express exceptions to the general prohibition against federal regulation of indirect sources of air pollution: "The Administrator shall have the authority to promulgate, implement and enforce regulations . . . respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources." *Id.* § 7410(a)(5)(B). Another provision of the CAA prohibits

Case 2:11-cv-08608-SJO-SS Document 19 Filed 05/29/12 Page 5 of 10 Page ID #:760

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

CIVIL MINUTES - GENERAL

CASE NO.: CV 11-08608 SJO (SSx)          DATE: May 29, 2012

states from adopting or enforcing emissions standards for "[n]ew locomotives or new engines used in locomotives." *Id.* § 7543(e)(1)(B). However, the Administrator can authorize California to adopt emissions standards for "other nonroad vehicles and engines" if necessary to "meet compelling and extraordinary conditions." *Id.* § 7543(e)(2)(A).

Plaintiffs contend that the interaction of these two provisions results in deregulation of railyard emissions at the state and federal levels. California cannot regulate locomotives, the primary DPM sources in railyards; the EPA can regulate locomotives, but cannot regulate railyards because they are indirect sources of air pollution. Plaintiffs argue that the loophole created by the overlap of these two laws was unintentional. Plaintiffs urge the Court to give effect to congressional intent by applying RCRA to prevent Defendants from continuing to exploit this unintended loophole. This argument is premised on the assumption that Congress did not intend to permit DPM to be emitted by engines gathered in one area in the amounts allegedly produced by Defendants' railyards. The Court is not persuaded that this "loophole" contravenes congressional intent.

Plaintiffs' argument would be more persuasive if Congress had mandated that the states regulate indirect sources. However, this is not a case of reverse preemption in which Congress decided that indirect sources should be regulated but at the state level. Rather, in this instance, Congress made no affirmative decision regarding the propriety of regulating indirect sources of air pollution. *See* 42 U.S.C. § 7410(a)(5)(A)(i) ("Any State **may** include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator **may** approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan." (emphasis added)). The statutory language permitting states to regulate indirect sources merely indicates that Congress did not intend to occupy exclusively the field of indirect air pollution sources. Although Congress may not have intended the precise loophole at issue in this case, the prohibition against federal indirect source regulation necessarily contemplates a situation in which indirect sources are largely unregulated. A state may choose not to regulate indirect source emissions or may not have the resources to take on the task.

Congress could have permitted federal regulation of indirect source emissions where there is no state regulatory scheme in place but chose instead to take a hands-off approach. Congress could also have remained silent on the issue, in which case Plaintiffs' argument might have been stronger. Instead, the statute provides a clear prohibition. Applying RCRA to indirect sources of air pollution would thwart congressional intent and render the statutory prohibition meaningless. It would be unreasonable to assume that even though Congress expressly prohibited federal indirect source regulation under the CAA, it implicitly intended to regulate indirect source emissions through the citizen suit provision of RCRA.

Plaintiffs attempt to downplay the importance of the prohibition by arguing that federal preemption of locomotive regulation makes railyards a special exception. Plaintiffs contend that Congress could not have intended to prohibit regulation of railyard emissions altogether. Plaintiffs would like

CASE NO.: CV 11-08608 SJO (SSx)          DATE: May 29, 2012

the Court correct the legislature's mistake. It is of no consequence that the state here is prohibited from regulating Defendants' particular indirect source of air pollution by other provisions of the CAA. The rationale underlying Plaintiffs' argument would be equally applicable to a non-railroad case in a state that chose not to regulate indirect source emissions. In such a case, DPM emanating from indirect sources would be no less harmful to the environment and public health, and the non-railyard indrect source would be similarly unregulated. Yet it would be unreasonable to argue under such circumstances that the district court should ignore the express prohibition against regulation of indirect source emissions. The same is true here.

Further, it is doubtful that Congress was ignorant of the existence of railyards as a source of pollution or the federal preemption of locomotive emissions regulation at the time that the CAA was amended. The 1990 amendments specifically address diesel emissions from locomotive engines. Railyards are a prime example of an indirect source. At the time that the legislature was contemplating solutions to air pollution caused by locomotives, it was also deciding whether to regulate indirect source emissions. Congress recognized that federal law might prohibit states from regulating air quality in certain areas or from certain sources. *See* 42 U.S.C. § 7410(a)(1)(E) (providing that states must give assurances that they have the authority to carry out an ambient air quality standard implementation plan and that they are "not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof").

Congress could have drafted an exception to the prohibition against indirect source regulation for indirect sources not subject to state regulation. Indeed, Congress expressly authorized federal indirect source review programs for "federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources." 42 U.S.C. § 7410(a)(5)(B). But no such exception exists for railyards. In light of the circumstances surrounding the 1990 amendments, it is unlikely that the non-regulation of railyards is the product of congressional oversight. Even if it were, the Court would be reticent to correct the oversight and effectively create an exception by applying a strained construction of RCRA based on nothing more than the general intent behind environmental protection laws.

Finally, it is worth noting that every direct source of DPM in Defendants' railyards is regulated by the CAA. The railyards, in and of themselves, do not emit anything. Thus, Plaintiffs' allegation that Defendants' railyards are left wholly unregulated if the Court elects not to apply RCRA is disingenuous. Although the railyards are not separately regulated as an indirect source of pollution, every direct source contributing to the collective railyard emissions is subject to regulation under the CAA. Plaintiffs argue that many of the direct sources of DPM on Defendants' railyards, namely older locomotives, are not subject to regulation under the CAA. But the Court agrees with Defendants that "[i]t is fanciful to suggest that, because Congress directed EPA to regulate emissions only from 'new' locomotives, it must have silently intended to authorize courts to impose additional regulation of all locomotives through RCRA citizen suits." (Reply 2.) Further, Congress expressly permitted California to adopt emissions standards for nonroad enigines and vehicles other than new locomotive engines unless, inter alia, "California does not need such

Case 2:11-cv-08608-SJO-SS Document 19 Filed 05/29/12 Page 7 of 10 Page ID #:762

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

CIVIL MINUTES - GENERAL

CASE NO.: CV 11-08608 SJO (SSx)                DATE: May 29, 2012

California standards to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(e)(2)(A)(ii).

Plaintiffs focus their argument on the general intent behind environmental legislation and RCRA specifically. Although Congress expressed a clear intent to reduce pollution and protect the environment and the public from the harm caused by industrial waste, the Court cannot ignore the indications that the loophole Plaintiffs complain of was created through a series of reasoned and calculated decisions by Congress and the EPA. Plaintiffs appear to recognize this, and argue in their Opposition that the Court should fashion a remedy under RCRA because "the EPA regulations will not provide relief for Plaintiffs until several decades into the future." (Opp'n 8.) Plaintiffs argue that "Defendants' theory, if true, would mean that neighbors of Defendants' railyards will need to wait decades, or longer, for relief from the toxic diesel pollution being disposed of by those railyards today." (Opp'n 1.) Plaintiffs' argument amounts to a complaint that Congress, the EPA, and CARB are not doing enough to regulate railyard emissions. Yet it is not for the Court to create a regulatory scheme where one does not exist or to apply a strained construction of RCRA to an area that Congress has chosen to regulate through the CAA.

   2.  <u>Applicability of RCRA</u>

Because Plaintiffs' proposed application of RCRA conflicts with the CAA, the Court must grant Defendants' Motion. But dismissal is also appropriate for an independent reason. Regardless of the conflict between the CAA and RCRA as applied to this case, Plaintiffs have failed to state a RCRA claim because diesel exhaust is not a "solid or hazardous waste."

Defendants argue that even if RCRA does not conflict with the CAA, the diesel emissions at issue in this case do not constitute discarded solid or hazardous waste sufficient to trigger regulation under RCRA. Plaintiffs allege that the DPM emitted from Defendants' railyards qualifies as both solid waste and hazardous waste under RCRA. Plaintiffs aver that Defendants dispose of tons of DPM annually by permitting it to be discharged into the air and eventually to fall to the ground. (*See* FAC ¶¶ 26, 27.) Defendants contend that emission of exhaust from burned fossil fuels is not "disposal" of waste and that the microscopic DPM component of diesel exhaust does not constitute a solid or hazardous waste sufficient to trigger regulation under RCRA. Thus, the validity of Plaintiffs' RCRA claim turns on whether emission of particulate matter in diesel exhaust by trains and vehicles collected in Defendants' railyards constitutes disposal of solid or hazardous waste subject to regulation under RCRA. Because this question has not been specifically addressed by other federal courts, the Court looks to the language of the statute. *See Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003) (en banc).

Under RCRA:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into

Case 2:11-cv-08608-SJO-SS Document 19 Filed 05/29/12 Page 8 of 10 Page ID #:763

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

CIVIL MINUTES - GENERAL

CASE NO.: CV 11-08608 SJO (SSx)       DATE: May 29, 2012

      or on any land or water so that such solid waste or hazardous waste
      or any constituent thereof may enter the environment or be emitted
      into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

"Solid waste" means "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations." 42 U.S.C. § 6903(27). On its face, the statutory definition of "solid waste" does not include uncontained gases. Plaintiffs argue that although it is initially transported by a gas, DPM consists of solid particles and should therefore be considered solid waste under RCRA. Plaintiffs' argument is unpersuasive for several reasons.

First, Plaintiffs' proffered definition of "solid" stretches the boundaries of the term to a point where it retains little meaning. When construing a statute, courts look to the plain meaning of the statutory language and "generally give words not defined in a statute their ordinary or natural meaning." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1041 (2004) (internal quotation marks omitted). Under Plaintiffs' proposed definition of solid waste, any gas containing compounds, regardless of size, that can be aggregated to form a solid or liquid substance would qualify as a solid waste under RCRA. This definition extends well beyond the ordinary meaning of the terms "solid," "semi-solid," and "liquid."

Further, the CAA contains a list of "hazardous air pollutants" that includes every single compound found in DPM that Plaintiffs allege constitutes solid waste. *See* 42 U.S.C. § 7412(b)(1). The CAA also provides a comprehensive regulatory framework to address the hazards posed by such compounds. *See id.* § 7412. This section of the CAA was enacted as part of the 1990 amendments, after RCRA was already in place. *See* Nov. 15, 1990, Pub. L. 101-549, Title III, § 301, 104 Stat. 2531. Given that Congress, through the CAA, has provided the EPA with a scalpel to address the problem of DPM with precision, it seems unlikely that Congress intended for the courts to address the issue by wielding RCRA like a sledgehammer.

Second, as Plaintiffs allege, all diesel exhaust contains DPM. If diesel exhaust were a solid waste when emitted by vehicles in Defendants' railyards, it would necessarily also be a solid waste when emitted by any diesel-burning vehicle anywhere. Plaintiffs attempt to invalidate this conclusion by arguing that "a single truck cannot do the damage that Defendants' railyards create every day." (Opp'n 9.) This argument conflates the statute's disposal of solid or hazardous waste requirement with its endangerment of public health requirement. Although Plaintiffs are correct that a single truck is unlikely to cause the imminent and substantial endangerment necessary to trigger RCRA's citizen-suit provision, a finding that emission of diesel exhaust constitutes disposal of solid waste in this instance would nonetheless bring every diesel-burning vehicle within the scope of RCRA. Further, that Congress and the EPA have created complex schemes to address diesel exhaust

CASE NO.: CV 11-08608 SJO (SSx)          DATE: May 29, 2012

directly through the CAA indicates that Congress did not intend for diesel exhaust to be covered under the more general provisions of RCRA. Plaintiffs have presented no authority that would justify such a significant expansion of RCRA to cover an area expressly regulated under the CAA.

Finally, the cases that Plaintiffs cite for the proposition that RCRA can be applied to uncontained gases are inapposite. (*See* Opp'n 13-14.) None of those cases dealt with a gaseous emission expressly regulated by the CAA, and most of them involve gases emitted by or resulting from the combustion of substances that themselves easily qualify as solid or hazardous waste under RCRA without resort to creative statutory interpretation. *See, e.g.*, *Sullins v. Exxon/Mobil Corp.*, 729 F. Supp. 2d 1129 (N.D. Cal. 2010) (vapors created by contaminated soil around leaking underground storage tanks); *Newark Grp. v. Dopaco, Inc.*, No. 2:08-cv-02623-GEB-DAD, 2010 WL 3619457, at *5 (E.D. Cal. Sept. 13, 2010) (vapors released by contaminated soil); *Voggenthaler v. Md. Square, LLC*, No. 2:08-CV-1618-RCJ-GWF, 2010 WL 2947296, at *1-2 (D. Nev. July 22, 2010) (vapors emanating soil contaminated by a dry cleaning solvent that had been classified by the EPA as hazardous waste under RCRA).

Further, as Plaintiffs recognize in their Opposition, "[t]hese cases have generally turned on whether the plaintiff demonstrated 'imminent and substantial endangerment,' not on whether pollutants transported by a gas form constitute a solid or hazardous waste." (Opp'n 13.) As a result, in many of the cases that Plaintiffs cite, the courts never reached the issue of whether the particular gases at issue constituted solid waste under RCRA. *See, e.g., Crandall v. City of Denver*, 594 F.3d 1231, 1235 n.2 (10th Cir. 2010) (expressly declining to address whether and to what extent vapors emitted by airplane deicing fluid were covered by RCRA); *Newark Grp.*, 2010 WL 3619457, at *5-7; *Voggenthaler*, 2010 WL 2947296, at *4 (noting that the defendants did not dispute the hazardous waste classification).

Plaintiffs argue that if Defendants' interpretation is correct, polluters could avoid RCRA jurisdiction by disposing of waste in a manner that ensures the waste will be airborne for some time before eventually settling to the ground. (Opp'n 15.) A company could, for example, aerosolize a liquid or semiliquid waste product.[1] The Court is not persuaded that Defendants' proposed interpretation presents such a problem.

Aerosolized solid waste would not lose its character as solid waste simply because it was disposed of through the air. But Plaintiffs do not allege that Defendants, in an effort to get rid of their stores of DPM, are turning a solid into a gas. Rather, Plaintiffs allege that Defendants, by burning diesel fuel, are **creating** waste in a gas form. The distinction is critical. Once solid waste exists, RCRA governs its disposal, storage, and treatment. For this reason, RCRA covers the

---

[1] Plaintiffs provide a more dramatic example, claiming that "all a polluter would have to do is pick up a shovelfull of toxic waste from its property and heave it over the fence onto a neighbor's" to avoid RCRA jurisdiction. (Opp'n 15.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

CIVIL MINUTES - GENERAL

CASE NO.: CV 11-08608 SJO (SSx)          DATE: May 29, 2012

vapors that emanate from solid waste and the air emissions that result when solid waste is burned. Similarly, RCRA governs waste that takes a solid or liquid form when created, even if the waste is produced in a process that begins with a non-waste feedstock. *See United States v. Power Eng'g Co.*, 10 F. Supp. 2d 1145, 1150 (D. Colo. 1998), *aff'd* 191 F.3d 1224 (10th Cir. 1999) (finding that a mist of chromium, lead, mercury, and arsenic that resulted from a process involving a non-waste feedstock was solid waste under RCRA).

Plaintiffs cite only one case, *Citizens Against Pollution v. Ohio Power Co.*, No. C2-04-CV-371, 2006 WL 6870564 (S.D. Ohio July 13, 2006), in which a court applied RCRA to an uncontained gas that was not the result of a method of disposing some solid or liquid substance. *Id.* at *5. In *Citizens Against Pollution*, the court found that RCRA applies to uncontained gases because the statute does not expressly exclude uncontained gases from its coverage. *Id.* at *5 ("The Court need not additionally determine whether the flue gas is a 'liquid, solid, semisolid, or contained gaseous material' because, interpreting the provision liberally, the reference to those materials in regards to discarded material is merely illustrative, not comprehensive.").

The court was able to reach this conclusion only by ignoring the well-established canon of statutory construction, *expressio unius est exclusio alterius*, which "creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." *Boudette v. Barnette*, 923 F.2d 754, 757 (9th Cir. 1991). This Court will not interpret the statute so broadly that the language "including solid, liquid, semisolid, or contained gaseous material" is rendered superfluous. The statute would not need to specify that "contained" gaseous material constitutes solid waste if Congress intended for all gaseous material to constitute solid waste.

The Court concludes that DPM allegedly emitted as diesel exhaust by vehicles in Defendants' railyards is not discarded solid or hazardous waste within the scope of RCRA's citizen suit provision. As such, Plaintiffs have failed to state a claim under RCRA.

III.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion and **DISMISSES** Plaintiffs' First Amended Complaint **WITHOUT LEAVE TO AMEND**. This action shall close.

IT IS SO ORDERED.