UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

OCT 30 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE; et al.,<br><br>       Plaintiffs - Appellants,<br><br> v.<br><br>BNSF RAILWAY COMPANY and UNION PACIFIC RAILROAD COMPANY,<br><br>       Defendants - Appellees. | No. 12-56086<br><br>D.C. No. 2:11-cv-08608-SJO-SS<br>U.S. District Court for Central California, Los Angeles<br><br>**MANDATE** |



**RECEIVED**
**CLERK, U.S. DISTRICT COURT**

10/30/14

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____MAT_____ DEPUTY

The judgment of this Court, entered August 20, 2014, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:
Molly C. Dwyer
Clerk of Court

Margoth Turcios
Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE; EAST YARD COMMUNITIES FOR ENVIRONMENTAL JUSTICE; NATURAL RESOURCES DEFENSE COUNCIL, INC., *Plaintiffs-Appellants*, | No. 12-56086 D.C. No. 2:11-cv-08608-SJO-SS |
| v. | OPINION |
| BNSF RAILWAY COMPANY; UNION PACIFIC RAILROAD COMPANY, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
April 8, 2014—Pasadena, California

Filed August 20, 2014

Before: Ferdinand F. Fernandez, N. Randy Smith,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

**SUMMARY**[*]

**Environmental Law**

The panel affirmed the district court's dismissal of an action filed by environmental organizations under the citizen-suit provision of the Resource Conservation and Recovery Act, seeking to enjoin the emission from defendants' railyards of particulate matter found in diesel exhaust.

The panel held that defendants' emission of diesel particulate matter did not constitute "disposal" of solid waste within the meaning of RCRA. Accordingly, plaintiffs could not state a plausible claim for relief under 42 U.S.C. § 6972(a)(1)(B).

**COUNSEL**

David Pettit (argued), Melissa Lin Perella, and Morgan Wyenn, Natural Resources Defense Council, Santa Monica, California, for Plaintiffs-Appellants.

Mark B. Helm (argued), Henry Weissmann, and Leo Goldbard, Munger, Tolles & Olson LLP, Los Angeles, California; Patrick J. Cafferty, Jr., Munger Tolles & Olson LLP, San Francisco, California; Kevin M. Fong, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, California; Mark E. Elliott, Michael R. Barr, Margaret Rosegay, and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Amy E. Gaylord, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, California, for Defendants-Appellees.

## OPINION

MURGUIA, Circuit Judge:

In this case, we must decide whether the citizen-suit provision of the Solid Waste Disposal Act (Resource Conservation and Recovery Act (RCRA)), 42 U.S.C. §§ 6901–6992k, may be used to enjoin the emission from Defendants' railyards of particulate matter found in diesel exhaust. RCRA's citizen-suit provision permits "any person" to sue the owner or operator of a solid waste treatment, storage, or disposal facility if the owner or operator "has contributed or . . . is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).  We conclude that Defendants' emission of diesel particulate matter does not constitute "disposal" of solid waste within the meaning of RCRA, and that Plaintiffs therefore cannot state a plausible claim for relief under § 6972(a)(1)(B).  We therefore affirm the district court's judgment.

## I.

Union Pacific Railroad and Burlington Northern Santa Fe Railway Companies (collectively, "Defendants") own and operate sixteen railyards in the State of California.  On or near those railyards, various locomotive, truck, and other heavy-duty vehicle engines emit tons of diesel particulate

Case 2:11-cv-08608-SJO-SS   Document 28   Filed 10/30/14   Page 5 of 24   Page ID #:795

matter—small, solid particles found in diesel exhaust—into the air.  The California Air Resources Board (CARB) has identified diesel particulate matter as a toxic air contaminant with the potential "to cause cancer and other adverse health problems, including respiratory illnesses and increased risk of heart disease."  The Environmental Protection Agency (EPA) has similarly classified diesel exhaust as likely to be carcinogenic to humans.

Plaintiffs are environmental organizations whose members live in the vicinity of Defendants' railyards.[1]  They allege, citing CARB studies, that "over 1.8 million Californians are at elevated [cancer] risk because of railyard operations."  Plaintiffs further allege that "people living in communities close to the source of [diesel particulate] emissions, such as ports, railyards and intermodal transfer facilities are likely to suffer greater health impacts and these impacts will likely add to an existing health burden."  In 2005, according to Plaintiffs, Defendants' railyards collectively emitted over 160 tons of diesel particulate matter into the air.

---

[1] Plaintiffs are the Center for Community Action and Environmental Justice (CCAEJ), East Yard Communities for Environmental Justice (EYCEJ), and Natural Resources Defense Council (NRDC).  CCAEJ proclaims itself to be "one of the oldest and most accomplished environmental health and justice organizations in the nation"; its work focuses on achieving environmental health and justice in Riverside and San Bernardino Counties, California.  Each of those counties is home to one railyard or intermodal facility owned by Defendants.  EYCEJ is another California environmental health and justice organization.  Its membership base is located in East Los Angeles, where Defendants' railyards are also located.  NRDC is a national organization dedicated to environmental justice and public health.

According to Plaintiffs, Defendants "have allowed and are allowing [diesel particulate matter] to be discharged into the air, from which it falls onto the ground and water nearby, and is re-entrained into the atmosphere." Plaintiffs acknowledge that diesel particulate matter is initially emitted into the air as diesel exhaust, but they contend that the solid particles in the exhaust are "transported by wind and air currents onto the land and water." They allege that the particles are "inhaled by people both directly and after the particles have fallen to the earth and then have been re-entrained into the air by wind, air currents and passing vehicles."

## II.

RCRA's citizen-suit provision authorizes private persons to sue "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Invoking that provision, Plaintiffs sued Defendants in the Central District of California, alleging that diesel particulates constitute "solid waste and hazardous waste," the "handling, storage, treatment, transportation, or disposal" of which Defendants have contributed or are contributing to. In their complaint, Plaintiffs sought injunctive and declaratory relief, asking the district court to declare Defendants' activities in violation of RCRA and order Defendants to take certain control measures to reduce diesel particulate emissions from their railyards.

Defendants moved to dismiss Plaintiffs' complaint, contending that Plaintiffs failed to state a claim under RCRA. Specifically, Defendants asserted that the provision of RCRA

6          CTR. FOR CMTY. ACTION V. BNSF

regulating air emissions, 42 U.S.C. § 6924(n), applies to air pollutants resulting from the burning of fuel "only when the fuel [itself] consists of or contains 'solid' or 'hazardous' waste, *i.e.*, a discarded material."[2]  All other air emissions, according to Defendants, fall within the statutory and regulatory scope of the Clean Air Act, the provisions of which Plaintiffs do not and cannot invoke.[3]  Defendants further argued that, even if Congress had intended RCRA to apply in this context, Plaintiffs could not prevail because Defendants did not emit diesel exhaust "into or on any land or water," and therefore were not "disposing" of solid waste within the meaning of RCRA.  *See* 42 U.S.C. § 6903(3) (defining "disposal" to mean "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that [the waste] may enter the environment or be emitted into the air or discharged into any waters").

In response to Defendants' motion to dismiss, Plaintiffs argued that failing to apply RCRA to the diesel particulates emitted at Defendants' railyards would result in a "gap in the

---

[2] Section 6924(n) requires the Administrator of the EPA to promulgate "regulations for the monitoring and control of air emissions at hazardous waste treatment, storage, and disposal facilities, including but not limited to open tanks, surface impoundments, and landfills." 42 U.S.C. § 6924(n).

[3] The Clean Air Act's citizen-suit provision is more limited than RCRA's.  Under the Clean Air Act, individuals may bring suit only to enforce the provisions of a permit or rules promulgated by the EPA. 42 U.S.C. § 7604(a)(1).  RCRA's provision, by contrast, authorizes suits against any person who "has contributed or who is contributing to the past or present . . . disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment," 42 U.S.C. § 6972(a)(1)(B), whether or not the person sued is complying with the terms of a permit or regulation.

[Clean Air Act] when it comes to emissions from railyards." Because, according to Plaintiffs, both the Clean Air Act and RCRA are intended to apply to mobile sources of air pollution—including diesel particulate emissions—the two laws can and should be "harmonized" to fill the regulatory gap that Plaintiffs contend otherwise results.

The district court granted Defendants' motion and dismissed Plaintiffs' complaint with prejudice.  In its order, the court concluded that the Clean Air Act, and not RCRA, applies to the emissions from Defendants' railyards and that any "gap" that might exist between the two statutory schemes "was created through a series of reasoned and calculated decisions by Congress and the EPA."  As an "independent reason" for granting the motion to dismiss, the district court noted that Plaintiffs failed to state a claim under RCRA because, even if RCRA does apply, "diesel exhaust is not a 'solid or hazardous waste.' "  Plaintiffs timely appealed the district court's order.

## III.

We review de novo a district court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  We accept as true the factual allegations in the complaint and construe those allegations in the light most favorable to the nonmoving party.  *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 849–50 (9th Cir. 2011).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  We will uphold a district court's decision to dismiss "where there is either a lack of a cognizable legal

theory or the absence of sufficient facts alleged under a cognizable legal claim." *Hinds Invs.*, 654 F.3d at 850.

To survive a motion to dismiss under RCRA's citizen-suit provision, Plaintiffs must plausibly allege that Defendants have contributed or are contributing to "the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). In other words, Plaintiffs must allege, based on a cognizable legal theory, (1) that Defendants have contributed to the past or are contributing to the present handling, treatment, transportation, or disposal of diesel particulate matter; (2) that diesel particulate matter is a "solid waste"; and (3) that the solid waste that Defendants emit "may present an imminent and substantial endangerment to health or the environment."

In their complaint, Plaintiffs allege that Defendants "dispose" of solid waste—specifically, diesel particulate matter—by allowing the waste to be "transported by wind and air currents onto the land and water near the railyards." According to Plaintiffs' allegations, the particulates are then "inhaled by people both directly and after the particles have fallen to the earth and then have been re-entrained into the air by wind, air currents, and passing vehicles." They contend that Defendants violate RCRA by failing to "limit or control the amount of [diesel particulate matter] generated on and by the railyards." Plaintiffs' allegations, however, even if true, do not establish that Defendants "dispose" of solid or

hazardous waste as the term "disposal" is defined under RCRA.[4]

Under RCRA, "disposal" means

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). Although that definition does not plainly state whether emissions of solid waste *into the air* fall within its scope, it does provide sufficient contextual clues for us to conclude that they do not. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.").

---

[4] Plaintiffs do not allege that Defendants contribute or contributed to the "handling," "storage," "treatment," or "transportation" of solid waste. Despite Plaintiffs' contention at oral argument that they had also alleged that Defendants contributed to the "handling" of solid waste within the meaning of § 6972(a)(1)(B), we find nothing in the record to support that assertion. Indeed, in opposing Defendants' motion to dismiss, Plaintiffs stated that "[t]he heart of this case is that Defendants' railyards contribute to the *disposal* of a solid hazardous waste—diesel particulate matter—that may present an imminent and substantial endangerment to the health of Plaintiffs' members." We therefore focus solely on the question whether the emission of diesel particulate matter by way of diesel exhaust from Defendants' railyards constitutes "disposal" within the meaning of RCRA. *See Ravell v. United States*, 22 F.3d 960, 962 n.2 (9th Cir. 1994) (declining to consider a claim raised for the first time at oral argument).

Our conclusion in that respect is consistent with other provisions of RCRA, and it does not conflict with the statute's purposes or its statutory and legislative histories. *See, e.g.*, *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (noting that courts resort to legislative history "even where the plain language is unambiguous, 'where the legislative history clearly indicates that Congress meant something other than what it said' " (quoting *Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747, 753 (9th Cir. 1999))).

### A.

We begin with RCRA's text.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1041 (9th Cir. 2004).  We note first that RCRA's definition of "disposal" does not include the act of "emitting."   Instead, it includes only the acts of discharging, depositing, injecting, dumping, spilling, leaking, and placing.  That "emitting" is not included in that list permits us to assume, at least preliminarily, that "emitting" solid waste into the air does not constitute "disposal" under RCRA.  *See* 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes & Statutory Construction § 47:23 (7th ed. 2012) (noting that *expressio unius est exclusio alterius* stands for the proposition that when Congress expresses meaning through a list, a court may assume that what is not listed is excluded).

The text of § 6903(3) is also very specific: it limits the definition of "disposal" to particular conduct causing a particular result.  By its terms, "disposal" includes only conduct that results in the placement of solid waste "into or on any land or water." 42 U.S.C. § 6903(3).  That placement, in turn, must be "so that such solid waste . . . may enter the

environment or be emitted into the air or discharged into any waters, including ground waters." *Id.*  We therefore conclude that "disposal" occurs where the solid waste is *first* placed "into or on any land or water" and is *thereafter* "emitted into the air."

The solid waste at issue here, however, at least as it is characterized in Plaintiffs' complaint, is not first placed "into or on any land or water"; rather, it is first emitted into the air. Only after the waste is emitted into the air does it then travel "onto the land and water."  To adopt Plaintiffs' interpretation of § 6903(3), then, would effectively be to rearrange the wording of the statute—something that we, as a court, cannot do.  Reading § 6903(3) as Congress has drafted it, "disposal" does not extend to emissions of solid waste directly into the air.

Other provisions of RCRA further support that conclusion.  The term "release," for example, which is defined in the section of RCRA governing underground storage tanks, includes "spilling, leaking, *emitting*, discharging, escaping, leaching, or disposing . . . into ground water, surface water or subsurface soils."  42 U.S.C. § 6991(8) (emphasis added).  "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (internal quotation marks omitted).  That Congress knew how to define "disposal" to include emissions, but nonetheless chose not to, counsels against our reading into the definition of "disposal" conduct that Congress must have intended to exclude from its reach.

*United States v. Power Engineering Co.*, 191 F.3d 1224 (10th Cir. 1999), which Plaintiffs cite for the proposition that "aerosolized solid waste would not lose its character as solid waste simply because it was disposed of through the air," is not to the contrary. In *Power Engineering*, the Tenth Circuit decided the question whether defendant Power Engineering Company was subject to certain financial assurance provisions of Colorado's RCRA State Implementation Plan. *Id.* at 1227–28. Power Engineering had been discharging hexavalent chromium and other hazardous materials into the soil on its facility's site, and the materials had then leaked into the groundwater and made their way into waters of the Platte River. *Id.* at 1229, 1231. The court concluded that disposing of the hazardous mist onto the soil constituted illegal "disposing of hazardous wastes." *Id.* at 1231. Contrary to Plaintiffs' contentions, *Power Engineering* did not involve disposal of solid waste "through the air," and so does not support the proposition that Plaintiffs attribute to it.[5]

Plaintiffs additionally contend that, because RCRA has an "air emissions" provision, *see* § 6924(n), "emitting" must fall within the statute's reach and therefore may form the basis of a citizen suit under § 6972(a)(1)(B). Plaintiffs read § 6924(n) as proof that both RCRA and the Clean Air Act extend to air emissions. Because that is so, Plaintiffs continue, the two

---

[5] Plaintiffs cite *United States v. Apex Oil Co.*, No. 05-CV-242-DRH, 2008 WL 2945402 (S.D. Ill. July 28, 2008), for a similar proposition, but that case is likewise inapposite. In *Apex Oil*, the vapors were disposed of onto the land, after which they leaked into groundwater and were released into the air. *Citizens Against Pollution v. Ohio Power Co.*, No. C2-04-CV-371, 2006 WL 6870564 (S.D. Ohio July 13, 2006), yet another case that Plaintiffs cite, is the only case that supports their interpretation. Because we find the reasoning of *Citizens Against Pollution* contrary to RCRA's text and legislative history, we decline to rely on it.

statutory schemes should be "harmonized" in a way that "give[s] effect to both." Plaintiffs suggest that we "harmonize" the two laws by reading RCRA's definition of disposal to include emissions of solid waste from Defendants' railyards.

We are not persuaded. Section 6924(n) of RCRA requires the EPA to promulgate regulations "for the monitoring and control of air emissions at hazardous waste treatment, storage, and disposal facilities, including but not limited to open tanks, surface impoundments, and landfills, as may be necessary to protect human health and the environment." Although that section clearly contemplates that certain air emissions will fall within RCRA's regulatory reach, it does not provide a private right of action. And § 6972(a)(1)(B), RCRA's citizen-suit provision, does not permit individuals to bring suit to enforce § 6924(n). Thus, the fact that RCRA permits the EPA to regulate air emissions is not to say that it provides "any person," by way of its citizen-suit provision, a private right of action with respect to those emissions. Indeed, as noted earlier, the very existence of § 6924(n) suggests that Congress, by not including "emitting" in the actions prohibited under § 6972(a)(1)(B), intended to exclude it.

Thus, we preliminarily conclude—based on the statute's wording considered alone and in context—that emitting diesel particulate matter into the air does not constitute "disposal" as that term is defined under RCRA. To the extent that the definition of "disposal" is ambiguous on this point, *see Citizens Against Pollution*, 2006 WL 6870564, at *5 (reaching a different conclusion), the statutory and legislative histories of both RCRA and the Clean Air Act resolve that ambiguity. We turn to those histories.

## B.

When the Clean Air Act was enacted in 1963, it left the task of controlling air pollution largely to the states. *See* Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392 (1963). It was not until 1970, after a comprehensive overhaul of the Act, that Congress adopted a national system of air quality standards, emission limits, and other requirements seeking to "preven[t] and control . . . air pollution at its source." Clean Air Act Amendments of 1970, Pub. L. No. 91-604, § 101(a)(3). The 1970 amendments required the federal government, by way of the newly created EPA, to establish National Ambient Air Quality Standards (NAAQS) for pollutants that adversely affect public health and welfare, as well as to establish national emission standards for "hazardous air pollutants." §§ 108–09, 112, 84 Stat. 1676, 1678–80, 1685–86. The 1970 amendments also required states to submit "State Implementation Plans" to "provid[e] for implementation, maintenance, and enforcement" of the NAAQS. § 110(a)(1), 84 Stat. at 1680.

Of particular relevance to this case, the legislative history leading up to the 1970 amendments suggests that Congress considered, but ultimately did not adopt, a provision that would have required the EPA to adopt national standards for emissions from locomotives. *See Hearings Before the Subcommittee on Air and Water Pollution of the Committee on Public Works*, 91st Cong. 139 (1970) (testimony of Robert H. Finch) (describing the provisions of Senate Bill 3229, which would have "authorize[d] the Department to establish national standards for the control of emissions from . . . locomotives" and noting that although "locomotives . . . are not major sources of air pollution at this time . . . , we support the principle of making them subject to emission controls").

Congress also recognized, but similarly opted not to address, the environmental problem arising from diesel emissions from heavy-duty trucks and buses. *See, e.g.*, *id.* at 65 (testimony of John Middleton) (noting that "beginning January 1, 1970, . . . all new diesel engines will necessarily comply with a smoke emission standard" but that "[t]he serious problem is what do you do with the used diesel vehicle or the used gasoline-fueled vehicle?").

Six years later, Congress enacted RCRA in an effort to "solv[e] the problems associated with the 3–4 billion tons of discarded materials generated each year, and the problems resulting from the anticipated 8% annual increase in the volume of such waste." H.R. Rep. No. 94-1491, at 2 (1976) (Conf. Rep.).[6] The law was intended to "eliminat[e] the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes." *Id.* at 4. As its name suggests, the law was intended to provide "two possible solutions" to the "discarded materials problem": (1) "resource conservation[, achieved] by reducing the amount of waste generated," and (2) "resource [recovery], achieved by reclaiming valuable materials from the waste and thereby reducing the volume to be disposed of." *Id.* at 10.

By its terms, RCRA thus governs the disposal of "discarded materials," including "solid waste." The law also governs "hazardous waste," which is "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may" cause, contribute to, or "pose a

---

[6] RCRA was enacted as an amendment to the Solid Waste Disposal Act, which was originally enacted in 1965. *See* Solid Waste Disposal Act, Pub. L. No. 89-212, 79 Stat. 997 (1965).

substantial present or potential hazard" to human or
environmental health. 42 U.S.C. § 6903(5).  RCRA provides
for solid and hazardous waste management, which are "the
systematic [control or] administration of activities which
provide for the collection, source separation, storage,
transportation, transfer, processing, treatment, and disposal
of" solid and hazardous wastes.  42 U.S.C. § 6903(7), (28).
When RCRA was enacted in 1976, it did not include a
provision regulating air emissions from solid or hazardous
waste disposal facilities.

In 1977, against the backdrop of RCRA's enactment the
year before, Congress again significantly overhauled the
Clean Air Act.  The 1977 overhaul was made in an effort to
provide additional guidance on matters like best available
control technologies, unregulated pollutants, and other issues
that had gone unaddressed in prior versions of the Act.  *See*
H.R. Rep. No. 95-564 (1977) (Conf. Rep.).  As part of the
1977 revision, Congress added two provisions relevant to this
case.

The first was a provision requiring the EPA to conduct a
railroad emissions study.    In response to industry
recommendations that Congress consider "[f]ederal
regulation of air pollutants emitted from railroad rolling
stock," Congress requested that the EPA conduct a study to
assess (1) "the extent to which emissions from railroads are
a national problem," (2) "state of the art of control
technology," and (3) "the kinds of regulations of emissions
currently imposed on railroads by State and local authorities."
S. Rep. No. 95-127, at 93 (1977); *see also* Clean Air Act
Amendments of 1977, Pub. L. No. 95-95, § 404, 91 Stat. 685,
793–94 (calling for a railroad emissions study).

The second was a series of provisions establishing what is known as the "indirect source review program."  Those provisions prohibited the federal government from regulating any "indirect source," or any "facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution," with the exception of those that are federally assisted, owned, or operated.  Pub. L. No. 95-95, § 108(e), 91 Stat. at 696.  The indirect source review program permits, but does not require, a state to regulate indirect sources as part of that state's Clean Air Act implementation plan.  *Id.*[7]  In this case, neither party disputes that Defendants' railyards are "indirect sources" within the meaning of the "indirect source review program" provision.

So, by 1977, the regulation of emissions from locomotives and railyards was governed solely by the Clean Air Act.  However, under its indirect source review program, the Clean Air Act prohibited federal regulation of sources like Defendants' railyards, leaving regulation of emissions from those sources entirely to the states.  RCRA, for its part, included no provision regulating air emissions and, indeed, did not even contemplate the disposal of material into the air; according to its stated purpose, RCRA was limited to

---

[7] A House Report from 1977 documents a few of the reasons that federal regulation of indirect sources of pollution was considered so controversial at that time: (1) indirect sources do not pollute and therefore shouldn't be subject to the Clean Air Act; (2) indirect source control should not be required before automobile pollution is fully controlled; (3) EPA has no express statutory authority over indirect sources; (4) "[i]ndirect source controls are veiled land use controls"; (5) indirect source controls will only delay development and construction, contributing to unemployment, inflation, and recession; and (6) indirect source controls will promote urban sprawl. H.R. Rep. No. 95-294, at 220–21 (1977).

18          CTR. FOR CMTY. ACTION V. BNSF

regulating "land disposal." *See* H.R. Rep. No. 94-1491, at 4
(1976) (Conf. Rep.).

That changed in 1984, when Congress amended RCRA to
include a provision regulating air emissions from certain
sources. That provision requires the EPA to "promulgate
such regulations for the monitoring and control of air
emissions at hazardous waste treatment, storage, and disposal
facilities." Hazardous and Solid Waste Amendments of 1984,
Pub. L. No. 98-616, § 201(n), 98 Stat. 3221, 3233. A Senate
Report summarizing the 1984 amendments sheds some light
on Congress's intent as to the scope of the emissions
provision:

> There is a considerable body of
> information indicating that emissions into the
> air from hazardous waste facilities pose a
> significant threat to health and the
> environment. Emissions of volatile chemicals
> from treatment, storage and disposal of wastes
> have been estimated to be of a similar
> magnitude as emissions of the same
> compounds from industrial processes. Studies
> of hazardous waste surface impoundments
> and landfills report that significant quantities
> of hazardous constituents in the wastes may
> be emitted into the air. . . .

> Proposals to regulate emissions from
> hazardous waste facilities have been
> published on several occasions since the
> passage of [RCRA] in 1976. Final regulations
> have never been issued. The Agency also has
> authority to regulate emissions of hazardous

air pollutants under the Clean Air Act, but its performance under that Act has been appallingly slow.

S. Rep. No. 98-284, at 63 (1983). Thus, with the 1984 amendments, Congress created the first (and only) overlap between RCRA and the Clean Air Act: regulation of emissions of hazardous air pollutants from "hazardous waste treatment, storage, and disposal facilities."

Congress most recently overhauled the Clean Air Act in 1990. *See* Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399. During that process, Congress amended the Act to require the EPA to promulgate regulations "containing standards applicable to emissions from new locomotives and new engines used in locomotives." *See* § 222(a), 104 Stat. at 2500.[8] The amended statute expressly prohibits the states from doing the same: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from . . . [n]ew locomotives or new

---

[8] The provision further states,

> Such standards shall achieve the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the locomotives or engines to which such standards apply, giving appropriate consideration to the cost of applying such technology within the period of time available to manufacturers and to noise, energy, and safety factors associated with the application of such technology.

§ 222(a), 104 Stat. at 2500.

engines used in locomotives." § 222(b), 104 Stat. at 2502.[9]
Pursuant to its legislative directive, the EPA promulgated the
"New Locomotive Rule," 63 Fed. Reg. 18978 (Apr. 16,
1998), and has since promulgated additional rules that apply
to emissions from heavy-duty vehicle engines and nonroad
vehicles. *See, e.g.*, 66 Fed. Reg. 5002 (Jan. 18, 2001)
(Heavy-Duty Highway Rule); 73 Fed. Reg. 37096 (June 30,
2008) (Updated New Locomotive Rule).

Thus, in 1990, regulation of emissions from locomotives
and railyards, which are indirect sources subject to the
indirect source review program, remained governed by the
provisions of the Clean Air Act.  By way of the Act's 1977
and 1990 amendments, regulation of locomotives and
locomotive engines was left exclusively to the EPA, and
regulation of railyards, as indirect sources of air pollution,
was expressly (although permissively) left to the states.
RCRA applied to neither.  The only overlap between the
Clean Air Act and RCRA was in the regulation of emissions
from "hazardous waste treatment, storage, and disposal
facilities."

\*   \*   \*   \*   \*

The statutory and legislative histories help to resolve any
textual ambiguities in at least two ways.  First, they make
clear that RCRA, in light of its purpose to reduce the volume
of waste that ends up in our nation's landfills, governs "land
disposal."   The Clean Air Act, by contrast, governs air

---

[9] The legislative history suggests that Congress enacted the prohibition
on state regulation in light of the "unconstitutional burdens" that such state
efforts "would impose . . . on interstate commerce." 136 Cong. Rec. H 12,
848 (daily ed. Oct. 26, 1990) (statement of Rep. Dingell).

pollutants.  To that end, the histories confirm our reading of the RCRA's text.

Second, the histories further clarify that Defendants' railyards, as "indirect sources" of air pollution, are excluded from regulation under both statutory schemes.  As we explained, when RCRA was amended in 1984 to include the emissions provision on which Plaintiffs rely here, the Senate Committee on Environment and Public Works noted that the EPA "has authority to regulate [these emissions] under the Clean Air Act, but its performance under that Act has been appallingly slow."  S. Rep. No. 98-284, at 63 (1983).  Thus, the emissions that Congress intended to be governed by the newly enacted RCRA provision were also, at that time, governed by the Clean Air Act.  Defendants' railyards, however, as indirect sources, fell outside the scope of the Clean Air Act, and therefore must also be excluded from RCRA's regulatory reach.

The upshot of that conclusion, of course, is that emissions such as those at issue here—emissions from indirect sources like railyards—fall entirely outside the ambit of federal regulation.  On one hand, the Clean Air Act's indirect source review program prohibits federal regulation of emissions from indirect sources; on the other, RCRA, as we interpret it, likewise does not extend to these emissions.  Plaintiffs, relying on the Supreme Court's decision in *Morton v. Mancari*, take issue with the regulatory "gap" that results and invite us to fill that gap by "harmonizing" the two statutory schemes.  *See* 417 U.S. 535, 551 (1974) ("When there are two acts upon the same subject, the rule is to give effect to both if possible." (internal quotation marks omitted)).  For two reasons, we decline the invitation.

First, the Supreme Court in *Morton* announced a rule disfavoring "repeal[s] by implication," reiterating instead that the legislature's intent to repeal must be clear. *Id.* at 550. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Id.* Under *Morton*, where two laws govern the same conduct, a court must identify the degree to which the two laws "irreconcilably conflict"; only where an irreconcilable conflict occurs will the court consider the later law to have impliedly repealed the earlier one. But where, as here, there is no overlap between the two laws, *Morton*'s rule simply does not apply.

But, *Morton* aside, the second reason we decline to fill the regulatory "gap" that Plaintiffs contend exists is because we agree with the district court that any "gap" is the product of a careful and reasoned decision made by Congress that we are not at liberty to disturb.  The statutory and legislative histories make clear that Congress, having identified specific reasons for its decision, intended to exclude indirect sources from federal regulation. And its reasons for doing so, *see* H.R. Rep. No. 95-294, at 220–21, are no less applicable under RCRA than they are under any other federal law.  Congress was entitled to leave the regulation of indirect sources to the states, and we defer to its reasoned judgment in doing so.

## IV.

We conclude that, by emitting diesel particulate matter from their railyards and intermodal facilities, Defendants do

not "dispose" of solid waste in violation of RCRA.[10]  That conclusion, in our view, follows relatively clearly from RCRA's text; however, to the extent that its text is ambiguous, RCRA's statutory and legislative histories resolve that ambiguity.   Thus, Plaintiffs fail to state a plausible claim for relief under § 6972(a)(1)(B).   We therefore **AFFIRM** the district court's judgment.

---

[10] Because we conclude that Defendants do not "dispose" of solid waste in violation of RCRA, we need not reach the parties' arguments about whether diesel particulate matter is indeed "solid waste" under 42 U.S.C. § 6903(27).   Likewise, we do not reach the question whether diesel particulate matter, if it is a solid waste, "present[s] an imminent and substantial endangerment to health or the environment." § 6972(a)(1)(B).